626 So.2d 555 (1993)
Dr. Darrell L. HENDERSON, et ux., Plaintiffs-Appellees,
v.
Hille DOMINGUE, Defendant-Appellant.
No. 93-102.
Court of Appeal of Louisiana, Third Circuit.
November 3, 1993.
Writ Denied January 28, 1994.
Lawrence N. Curtis, Lafayette, for Dr. Darrell Henderson.
James T. Guglielmo, Opelousas, for Hille Domingue.
*556 Before YELVERTON, KNOLL and THIBODEAUX, JJ.
KNOLL, Judge.
Hille Domingue (Domingue) appeals an adverse judgment in this legal malpractice case. Domingue stipulated[1] that he was negligent, but contends his negligence did not cause any damage to Darrell and Toye Henderson (Hendersons), his clients who had retained him to represent them in an income tax dispute between them and the Internal Revenue Service (IRS). The tax dispute involved the deductibility of research and development expenses which the Hendersons sought on their 1982 income tax returns. The trial court concluded that the Hendersons would have been successful in litigating their claim in the Tax Court. It awarded the Hendersons $130,000 in damages, together with $10,000 for mental anguish. The Hendersons' claim for attorney's fees was denied. Domingue appeals, contending that the trial court erred: (1) in finding that his negligence caused any damages to the Hendersons; and, (2) in its assessment of $140,000 damages.
The Hendersons answered the appeal, contending that the trial court erred in denying their claim for attorney's fees.[2]

FACTS
The learned trial court provided us with well written reasons for judgment which state the following facts:
"In 1984 the Hendersons retained Hille Domingue to represent them on an income tax dispute between the plaintiffs and the Internal Revenue Service. On their 1982 tax returns, the plaintiffs sought deductions for research and development expenditures claimed by them under Internal Revenue Code, Section 174(a)(1). The funds which were expended were for the development of certain component parts of an amphibian aircraft. Subsequently, the IRS disallowed the deduction and the Hendersons, through the services of Hille Domingue, filed their petition in tax court. The suit in the tax court was later dismissed (apparently due to inaction on the part of Domingue) and consequently this action for malpractice was filed against Hille Domingue ...
In 1982 Dr. Darrell Henderson's primary occupation was that of a plastic surgeon in Lafayette. He was also actively involved in the air charter business. The evidence... established that Dr. Henderson was involved in the aviation charter business from 1970 through the mid-1980's, as well as owning an interest in a number of planes. Another contribution made to the aircraft charter business by Dr. Henderson was the modification of planes in order to enhance their usefulness in plaintiff's charter business.
* * * * * *
In the early 1980's Dr. Henderson became acquainted with a particular aircraft that was to be built, known as an amphibian. This particular type of aircraft was to be a twin engine plane known as the Avalon Twin Star 800. No such craft had been built commercially since about 1940. In conjunction with Mr. Paul Fournet, Dr. Henderson felt that such a plane had great potential in this area as a means of taking people to and from oil rigs. Unlike an ordinary float plane, this aircraft, commonly referred to as a `flying boat', was designed to be able to land in rough offshore waters, which would be quite suitable and economical for this area's oil industry....
[Dr. Henderson] decided to invest in the Sea Star program for the future development of the Avalon Twin in the hopes of *557 using it in the air charter business. The Avalon Twin consisted of 185 components on which Sea Star would perform research thus eventually leading to the development of the aircraft.
On December 15, 1989, the Hendersons entered into an agreement with Sea Star to purchase the research and development of two specific component parts."
Under this agreement, Sea Star was responsible for developing the component parts (through the subcontractor, Airmaster). Simultaneously, the Hendersons entered into a non-exclusive licensing agreement giving Sea Star and Airmaster the right to use the components in the production of Avalon Twin aircraft. The Hendersons were to receive a $1300 royalty for every aircraft built. However, these plans were never realized. Due to financial difficulties, the Avalon Twin never reached the production stage.
The record reveals the Hendersons were actively involved in their own air charter business. They helped develop several innovative avionic systems for use in their charter business. These included an intercooler for an aircraft engine; a new insulation material to decrease cabin noise; advanced navigation systems and fuel indicators; a safer type of battery than previously used; and other useful improvements.

DEDUCTION OF TRADE OR BUSINESS
The central issue to the case sub judice is whether the U.S. Tax Court would have allowed the Hendersons' deduction. Thus we must attempt to step into the shoes of the Tax Court and rule as we believe it would.
This case turns on the interpretation of 26 U.S.C.A. 174(a)(1). This section of the Internal Revenue Code provides for deduction of "research or experimental expenditures which are incurred ... in connection with his [the taxpayer's] trade or business". The parties have cited several cases dealing with partnerships formed to take advantage of this codal section, Cleveland v. C.I.R., 297 F.2d 169 (4th Cir.1961), Levin v. C.I.R., 832 F.2d 403 (7th Cir.1987), Diamond v. Commissioner, 92 T.C. 423, 1989 WL 13679 (1989). The outcome of these cases depended on the level of involvement the taxpayer exercised in the trade or business being developed. Through these cases, the courts developed a distinction between active participants in the trade or business concerned and mere passive investors.
While these cases provide a helpful background, there are two additional cases that will be the crux of this analysis, Zink v. U.S., 929 F.2d 1015 (5th Cir.1991) and Hattier v. Commissioner, 58 T.C.M. (C.C.H.) 1109, 1990 WL 63 (1990). Both Zink and Hattier involved the same Sea Star program for buying Avalon Twin components. In Zink, the taxpayer was a physician and in Hattier, a lawyer. Apparently neither had any involvement with the aviation industry other than the Avalon Twin venture. In both cases the court found the expenditures were not "in connection with his [taxpayer's] trade or business" and the deductions were not allowed.
However, even though we are dealing with the same financial venture, the case sub judice is a much closer issue. This is because the Hendersons were actively involved in an aviation related trade or business. Thus we must determine if the Hendersons' air charter business was closely enough "connected" to the expenditures on the Avalon Twin components, such that the expenditures come within the purview of section 174.
Domingue claims the Zink case is dispositive on this issue. He cites Zink for the proposition that the Hendersons must not only be involved in the general aviation industry, but actually involved in the development of aircraft components before the Hendersons' expenditures will be deductible. Thus the Hendersons are no different from the mere "investors" in Zink. Domingue relies heavily on the language in Zink finding no "realistic prospect existed that they would enter a trade or business involving the development of aircraft components." (Emphasis added.) However, we believe it is misleading to define the scope of "trade or business" based on this one sentence. Indeed, in the previous sentence, the court stated, "The evidence of the Zinks' involvement with the airplane business was insufficient as a matter of law to establish they were engaged in *558 the airplane business or trade." (Emphasis added.) We find it significant that the Zink court also cited with approval the Hattier case holding that "the controlling inquiry under section 174 is whether during the years in issue, there was any `realistic prospect' that the [taxpayer] in question would enter a `trade or business' involving the technology being developed." By using the broader terms "airplane business" and "technology being developed", the Zink and Hattier courts undercut Domingue's narrow interpretation of trade or business. As a further distinction from the case sub judice, not only were the Zink taxpayers not involved in a component parts trade or business, they were not involved in any other aspect of the aviation industry. The Zink court specifically pointed out the type of business the taxpayers were involved in, "they never engaged in any type of business other than Dr. Zink's practice of medicine, her [Mrs. Zink] job as an elementary education professor, and the rental of their farm."[3]
We believe the language and facts of the Zink case evidence a broader interpretation of "trade or business" than Domingue advocates. Clearly the Hendersons were involved in the air charter business. The "technology involved" in the research expenditure was intended to develop an aircraft uniquely suited to support the offshore oil industry. It is obvious this technology would be extremely useful to the Hendersons' trade or business of air chartering. Thus we hold that the expenditures were connected to the Hendersons' trade or business within the meaning of section 174.
As further support for our decision, we note that even viewed in the light most favorable to Domingue, the evidence of what the Tax Court would have decided is equivocal. Jenkins v. St. Paul Fire & Marine Ins. Co., 422 So.2d 1109 (La.1982), holds that in a legal malpractice claim, where the plaintiff proves the defendant's negligence in allowing a claim to prescribe, the burden shifts to the defendant to prove the plaintiff would not have prevailed on the merits. In the case sub judice, the issue is a highly technical question in a specialized area of the law. Domingue cites no IRS regulation or ruling that interprets "trade or business" as narrowly as he would have us hold. Moreover, the facts differ substantially from the closest case on point. We can not say Domingue has carried his burden of proving the Tax Court would have ruled against Henderson.

DAMAGES
The trial court awarded the Hendersons $130,000 as compensation for the action Domingue allowed to prescribe. It based this sum on the testimony of Domingue during the trial. On appeal, this issue was highly contested. The estimates of damages have ranged from $130,000 to less than $2,000. In reviewing the record, we have found the testimony we believe the trial judge relied upon:
"Plaintiff's Attorney: Now, tell me, sir, in the event that this Court should find that Dr. Henderson would have prevailed had he proceeded with this case [in the Tax Court], it is your opinion that part of the damages in this case would consist of the tax lien taken against Dr. Henderson for $130,000; is that right?
Defendant: That's correct."
At that point, there was no further effort by Domingue or his attorney to explain or qualify this answer. While supreme efforts were made elsewhere during trial to cast doubt on this amount, we understand why this testimony would heavily influence the trial court. The court below was faced with diametrically opposed expert witnesses. We cannot fault the trial judge for believing the Hendersons' expert when Domingue himself apparently agreed with that expert. Additionally, we are conscious that the trier of fact's discretion in the amount of an award of general damages is "great, and even vast, so that an appellate court should rarely disturb... (such) and award." Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). We affirm the trial court's award.

*559 DAMAGES FOR MENTAL ANGUISH
The Hendersons allege they suffered humiliation, embarrassment, and mental anguish because of Domingue's negligence. The record indicates a tax lien was taken against the Hendersons' property and notice of the lien appeared in the local newspaper. The record also indicates the Hendersons received several letters from the IRS demanding payment. Dr. Henderson testified he attempted to contact the defendant but could get no response. The Hendersons' accountant also attempted to contact the defendant to no avail. Defendant could neither confirm nor deny receiving these letters because he was having "problems" with his files. The trial court awarded the plaintiffs $10,000 for mental anguish "due to the Judgement taken against Dr. Henderson and his property." However, the court cited no authority for this award.
Neither the parties nor this court has found a Louisiana case awarding damages for mental anguish in a legal malpractice suit. The defendant cites Richards v. Cousins, 550 So.2d 1273 (La.App. 4th Cir.), writ denied, 552 So.2d 397 (La.1989), for the proposition that the Hendersons are not entitled to mental anguish damages. We find this case distinguishable since the Richards court specifically found "the plaintiffs' losses were strictly pecuniary." The record before us clearly reflects the Hendersons suffered serious aggravation and grave concern over their encounter with the IRS's collection division.
While we find no cases awarding mental anguish damages in legal malpractice, we believe such an award rests solidly on the foundation of general tort principles. First, we note an action for legal malpractice is plainly a tort. In Cherokee Restaurant, Inc. v. Pierson, 428 So.2d 995 (La.App. 1st Cir.), writ denied, 431 So.2d 773 (La.1983), the court explained:
"Conceptually, the action for legal malpractice is no different than the action for medical malpractice. Both entail a deviation from the accepted standard of care of the profession. Although the attorney-client relationship gives rise to an implied warranty of the attorney to use his best professional skill and judgment, this duty is legal rather than contractual in nature, and a breach of this duty amounts to a tort." (Citations omitted.) Id., at p. 998.
Secondly, the Supreme Court in Meador v. Toyota of Jefferson, Inc., 332 So.2d 433 (La. 1976), found it is "fundamental" that:
"damages for mental anguish, aggravation, distress and inconvenience, are recoverable in an action sounding in tort. La.Civil Code art. 2315; 2 M. Planiol, Traite elementaire de droit civil, no. 252 at 152 (11th ed., La.State L.Inst.tranl.1959); 48 Tul. L.Rev, supra at 1171." Id. at p. 438.
Finally, there are Louisiana cases awarding damages for the type of injury the Hendersons sustained. These cases address the humiliation and embarrassment suffered by a plaintiff when his property is wrongly sequestered. Chapman v. Steckler, 442 So.2d 909 (La.App. 3 Cir.1983).
We find no difference between the damages recoverable in legal malpractice and those recoverable in any other action sounding in tort. Nor do we see a reason to draw a distinction between the injury caused by a creditor's wrongful sequestration and the injury caused when the IRS places a lien on a plaintiff's property because of an attorney's negligence. Both of these actions result in the same type of embarrassment and damage to credit reputation. Indeed, Dr. Henderson testified that even at the time of trial, he still had to explain the tax lien in connection with any loan request.
It is reasonable to assume the lien would have been avoided if Domingue had reacted to the letters from the IRS. Furthermore, Dr. Henderson testified he was "going nuts" between the ominous demands of the IRS and his inability to get an explanation from the Domingue. We do not find the trial court's award of $10,000 for mental anguish was contrary to law or an abuse of discretion.

ATTORNEY'S FEES
The Hendersons assert the trial court erred when it refused to award attorney's fees against Domingue. The Hendersons cite Ramp v. St. Paul Fire & Marine Ins. Co., 263 La. 774, 269 So.2d 239 (1972) and Jenkins v. St. Paul Fire & Marine Ins. Co., *560 393 So.2d 851 (La.App. 2nd Cir.1981), affirmed, 422 So.2d 1109 (La.1982), for authority that attorney's fees are allowable in this instant. It is clear to us that Ramp and the cases following it hold that the plaintiff is not entitled to attorney's fees associated with prosecuting the malpractice claim. However, these courts have awarded attorney's fees associated with the underlying action which the defendant attorney negligently handled. For example, in Ramp, the defendant negligently handled a succession forcing his clients (the heirs) to engage in litigation to recover their legitime. The court didn't award fees in the malpractice suit but did make such an award for the amount the heirs spent employing another attorney to recover the legitime. Similarly, in Jenkins, the plaintiff was not awarded attorney's fees incurred pursuing the malpractice action. However, an award was made covering the cost of determining the underlying claim of a railroad's liability, the negligent handling of which was the basis for the malpractice action.
The Hendersons claim it would have cost them $12,000 to prosecute their case in the U.S. Tax Court, thus making an award in this amount appropriate. However, we do not believe this expense is recoverable under the prior jurisprudence. Ramp and Jenkins both involve awards for the cost of "mopping up" the negligently handled case that was the basis for the malpractice action. In the case sub judice, the Hendersons have not shown any future litigation will be required in the Tax Court. While there is mention in the record of the Hendersons hiring other attorneys to settle their dispute with the IRS, there is no evidence as to the amount of these expenditures. Therefore we have no basis for making an award. Therefore we hold the trial court properly denied the Hendersons' claim for attorney's fees.
For the above and foregoing reasons, we affirm the judgment of the trial court. We assess costs to defendant, Hille Domingue.
AFFIRMED.
NOTES
[1] The stipulation reads: "IT IS HEREBY STIPULATED by Hille Domingue that he is liable for any damages, if any, that were sustained by petitioners herein, based on the cause of action asserted by petitioners in the above captioned lawsuit. Accordingly, the only issue to be resolved, by compromise or trial, is the amount of damages, if any, that were sustained by petitioners."
[2] In the Hendersons' brief, they also request that we award them the expert witness costs. LSA-C.C.P. Art. 2133 provides that in answering an appeal, the appellee must "stat[e] the relief demanded". In the case sub judice, the appellees' request for expert witness costs appears only in brief. Accordingly, on the basis of Art. 2133, we may not consider this issue. See, Graff v. Fazende, 172 La. 441, 134 So. 387 (1931).
[3] The Hattier court also relied on the taxpayer's noninvolvement in the aviation industry in finding the expenditures unconnected to the taxpayer's trade or business.