917 So.2d 688 (2005)
James WHITTINGTON, Plaintiff-Appellant,
v.
Kirby D. KELLY, Christopher Phillip and the Law Firm of Kirby D. Kelly, Defendant-Appellees.
No. 40,386-CA.
Court of Appeal of Louisiana, Second Circuit.
December 14, 2005.
*690 Bengtson Law Firm, LLC by Karl W. Bengtson, for Appellant.
Cook, Yancey, King & Galloway by Herschel E. Richard, Jr., Shreveport, Jason B. Nichols, for Appellees.
Before GASKINS, MOORE and LOLLEY, JJ.
MOORE, J.
James Whittington appeals a summary judgment that dismissed his legal malpractice claims against Kirby D. Kelly, Charles T. Phillips and Kirby D. Kelly, A Professional Law Corporation (referred to collectively as "Kelly").[1] We affirm.

Factual Background
The case arises from Kelly's failure to file a suit for Whittington's sexual harassment claim against his former employer, Chiles Offshore LLC, and Chiles's principal, Shell Oil Co. Whittington's deposition establishes the following facts. Whittington took a job as a roustabout with Chiles, an offshore drilling company, in January 2001. Chiles had a contract with Shell to provide drilling services on the Magellan, an offshore rig in the Gulf of Mexico. Whittington's work schedule was 14 days on and 14 days off. While on the rig, Whittington became friends with Rusty Wise, Shell's day shift supervisor. The two men worked out together in the rig's exercise room; according to Whittington, they made friendly wagers as to who could lift more weight. As a result, Whittington had won several Shell gas cards, and Wise had given him some baseball caps as gifts.
Coworkers on the rig began to tease Whittington about being a "brown-noser." On the morning of October 21, 2001, Whittington finished his night shift and was returning to the change room. On the wall he saw a hand-drawn caricature depicting the back of a man (labeled "Jimmy," Whittington's nickname) kneeling in front of a standing man (labeled "Rusty"), in a posture perhaps suggestive of a lewd act. Xerox copies of the drawing, which had been created by Fitzgerald Holmes, a galley hand, were also posted in the rig's galley, eating room, TV room, hallways and stairs.
Whittington immediately complained to the rig manager, John Cormier. Cormier apologized to Whittington and said he would get to the bottom of the incident. Cormier then spoke to Wise, and a meeting of the entire crew was called for 6:00 pm that evening. At the meeting, Wise announced that this behavior was unacceptable and could result in legal action against both Shell and Chiles. He apologized to Whittington and reprimanded Holmes for drawing the caricature. He also reprimanded Mike Dailey, Shell's night shift manager, for making the copies that were posted around the rig; Holmes did not have access to a Xerox machine.
After the meeting, Whittington reported to his night shift but other workers continued to "pick on" him, saying that he and Wise were "really hooked up." Whittington quit that night, before his shift was over. His immediate supervisor, Donnie Collins, and Cormier tried to dissuade him from leaving, but his mind was made up. He went ashore by helicopter, returned *691 home to Vidalia and did not seek any mental or physical health treatment as a result of the incident.
Several months later, in late July or early August 2002, Whittington called Kirby Kelly, whom he had known since their teenage years. Kelly sent an investigator to interview Whittington in Winnsboro; about two weeks later Whittington met with Kelly and two of his associates at their office in Shreveport.
Whittington's affidavit asserts that they had extensive discussions before he retained Kelly on a contingency basis to pursue his sexual harassment claim; Kelly advised him that he had a "good case" and could recover significant money damages. Whittington specifically recalled Kelly telling him "he would tear their a * * up and would put a `whuppin' on them." At Kelly's direction, Whittington made several trips to Shreveport to see Dr. Don Heacock, a clinical social worker, and Kelly frequently reassured him that he would receive a large sum of money in compensation. Neither Kelly nor any of his associates ever advised Whittington that the events at work or his damages would be insufficient to support a claim.
On August 28, 2002, Whittington swore out an affidavit for a charge of sexual harassment; on October 18, he signed a charge of discrimination on a form provided by the EEOC. On November 4, Kelly sent a demand letter to Chiles and Shell, alleging "significant emotional trauma" and requesting a total of $750,000 in settlement.
On November 22, 2002, Kelly advised Whittington by certified mail that he could no longer represent him in the matter, as the case required an attorney licensed in Texas, and the only such lawyer on Kelly's staff was about to leave his firm. Kelly reiterated, "I believe you have a good claim and I further believe you were greatly harmed," and advised him to consult a Texas attorney "as soon as possible in that certain time limitations are running which could prevent you from filing suit later." On November 26, Whittington directed Kelly to send his file to his new attorney.
Whittington filed the instant legal malpractice suit against Kelly, his associate Phillips, and Kelly's law firm on August 28, 2003. He alleged that the EEOC declined to pursue his sexual harassment and discrimination charges, and that the defendants failed to file "appropriate federal and state lawsuits against Chiles or Shell within the required prescriptive period." He sought damages for the loss of his claims of sexual harassment, as well as for intentional infliction of emotional distress, medical expenses, attorney fees and other special damages.
The defendants denied virtually all of Whittington's allegations, i.e., that he suffered any physical injuries, that his claim was based on sex or a hostile work environment, and that the incident had any tangible effect on his employment. Later they moved for summary judgment, urging there was no genuine issue of material fact as to whether Whittington could have prevailed in "his purported sexual harassment suit" against his employers. Specifically, they argued Whittington could not show he was discriminated against at work because of his sex, and even if he could show this, he could not state a claim for a hostile work environment under either federal or state law. In support, they attached a copy of Whittington's deposition, along with various deposition exhibits.
Whittington opposed the motion, urging that the "motivation of the harassers" and the extent of their activity were genuine issues of material fact precluding summary judgment. He also urged that even if he could not prove the underlying claim, he *692 was entitled to damages for emotional distress arising from the defendants' negligent handling of his case, citing Beis v. Bowers, 94-0178 (La.App. 4 Cir. 1/19/95), 649 So.2d 1094, writ denied, 95-0429 (La.3/30/95), 651 So.2d 847. In support, he attached two personal affidavits, a copy of his affidavit to the EEOC in pursuit of his harassment claim, and copies of letters from Kelly, all summarized above.
After a hearing in January 2005, the district court orally ruled that Whittington failed to produce any evidence of either a hostile work environment or of discrimination on the basis of sex. Further, Whittington proved only a single "tasteless prank" which his employers took immediate measures to remedy. Finally, the court stated that as a matter of law, the second circuit has not allowed damages for negligent infliction of emotional distress in this type of legal malpractice claim. Jarrell v. Miller, 38,360 (La.App. 2 Cir. 9/9/04), 882 So.2d 639, writ denied, 2004-2488 (La.12/17/04), 888 So.2d 868. Finding no genuine issues of material fact, the court granted summary judgment, and this appeal followed.

Applicable Law
The motion for summary judgment is a procedural device to avoid a full-scale trial when there is no genuine issue of material fact. Kay v. Carter, 243 La. 1095, 150 So.2d 27 (1963); Argonaut Great Cent. Ins. Co. v. Hammett, 39,024 (La.App. 2 Cir. 11/17/04), 887 So.2d 704, writ denied, XXXX-XXXX (La.2/25/05), 894 So.2d 1151. Summary judgment procedure is designed to secure the just, speedy and inexpensive determination of every action, except certain domestic actions; the procedure is favored and shall be construed to accomplish these ends. La. C.C.P. art. 966 A(2); Racine v. Moon's Towing, 2001-2837 (La.5/14/02), 817 So.2d 21. The motion should be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966 B. Appellate review of the grant or denial of a summary judgments is de novo. Jones v. Estate of Santiago, XXXX-XXXX (La.4/14/04), 870 So.2d 1002.
To establish a claim for legal malpractice, a plaintiff must prove: (1) the existence of an attorney-client relationship; (2) negligent representation by the attorney; and (3) loss caused by that negligence. Failure to prove one of these elements is fatal to the claim. Costello v. Hardy, XXXX-XXXX (La.1/21/04), 864 So.2d 129. A plaintiff can have no greater rights against attorneys for the negligent handling of a claim than are available in the underlying claim. Id., and citations therein.

Discussion  Underlying Claim
By his first specification of error, Whittington urges the district court erred in finding he could not have prevailed in his underlying claim. He argues that his claim presumptively had value, since Kelly agreed to take it on a contingency basis. Jenkins v. St. Paul Fire & Marine Ins. Co., 422 So.2d 1109 (La.1982). He further argues that most sexual harassment claims are "focused on the issue of the harassers' intent or motivation"; in support he cites Meritor Sav. Bank FSB v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Because the defendants offered no evidence as to the "essential elements" of the underlying claim, Whittington concludes summary judgment was not proper.
State law prohibits sexual discrimination and harassment in employment. La. R.S. 23:332. Louisiana's law *693 mirrors the federal statute, 42 U.S.C. § 2000e, et seq. ("Title VII"). Louisiana courts therefore look to the federal statute to ascertain the validity of a sexual harassment claim. Boudreaux v. Louisiana Casino Cruises Inc., 99-1168 (La.App. 1 Cir. 6/23/00), 762 So.2d 1200, writ denied, 2000-2229 (La.10/27/00), 772 So.2d 651. There are two types of sexual harassment claims: one based on the quid pro quo theory, and the other based on the theory of a hostile work environment. Meritor Sav. Bank v. Vinson, supra. Whittington's claim against Chiles and Shell was obviously based upon the latter.
To prevail in a sexual harassment claim based on a hostile work environment, the plaintiff must prove (1) that he belongs to a protected class; (2) that he was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment affected a "term, condition or privilege of employment"; and (5) that the employer either knew or should have known of the harassment and failed to take prompt remedial action. Boudreaux v. La. Casino Cruises, supra. Notably, for sexual harassment to be actionable, it must be "so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." Faragher v. Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Upon de novo review of the summary judgment evidence, we find that Whittington could not have prevailed on his sexual harassment claim, and there is no genuine issue to forestall that finding.
The offensive conduct  the posting of the caricature  occurred only once and was not characterized by multiple or varied incidents. This does not satisfy the standard of "severe or pervasive." Clark County School Dist. v. Breeden, 532 U.S. 268, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001); Lee v. Delta Air Lines Inc., 00-1034 (La.App. 1 Cir. 1/30/01), 778 So.2d 1169. Moreover, it does not appear that the harassment was based upon sex. Whittington admitted in deposition that his coworkers perceived him as a "brown-noser" trying to gain favor with the rig supervisor; they teased him about this, and the caricature was part and parcel of the teasing. While coarse and tasteless, the drawing appeared to relate to other aspects of the employment and not to Whittington's sex. Bennett v. Corroon & Black Corp., 517 So.2d 1245 (La.App. 4 Cir.1987), writ denied, 520 So.2d 425 (1988); Brown v. Henderson, 257 F.3d 246 (2 Cir.2001); Allen v. Mineral Fiber Specialists Inc., ___ F.Supp.2d ___, 2004 WL 231293 (E.D.Pa.2004). Finally, as soon as they learned about the incident, Cormier and Wise called a personnel meeting, shutting down the entire rig to reprimand the culprits and advise everyone that such behavior was unacceptable. Although the ribbing continued, there is no evidence that the employers failed to take prompt and effective remedial action.
Whittington further argues that the underlying case was one of same-sex harassment, recognized as actionable in Oncale v. Sundowner Offshore Serv. Inc., 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), and as such the motivation and even sexual orientation of the harassers were relevant to prove his claim. However, the court in Oncale reiterated that the claimant still must prove conduct "severe or pervasive enough to create an objectively hostile or abusive work environment." 523 U.S. at 81, 118 S.Ct. at 1003. For the reasons already discussed, the evidence simply did not meet this standard.
Upon de novo review, we find Whittington would not have been able to prove economic damages resulting from Kelly's failure to exercise reasonable diligence in *694 handling the sexual harassment claim. The district court did not err in sustaining the summary judgment on this ground.

Emotional Distress
By his second specification of error, Whittington urges the district court erred in finding that his malpractice claim was not one which would support a claim for damages in addition to the value of the underlying claim. He contends that his sexual harassment action involved not only an emotional injury caused by the harassment, but also the emotional need for vindication by legal recourse against the harassers.
In support, Whittington cites several cases in which legal malpractice plaintiffs prevailed in proving their underlying claims and, in addition, received damages for the emotional distress engendered by the attorneys' negligence.[2] Such is obviously not the case here; Kelly showed that Whittington could not have prevailed on his underlying action.
More specifically, Whittington relies on Beis v. Bowers, supra, for the proposition that even when there is no provable underlying claim, the plaintiff is entitled to recover any damages caused by the attorneys' legal malpractice. The attorneys in Beis told the plaintiff that she "very definitely" had a valid claim but then failed to file her suit on time. The district court granted the attorneys' motion for summary judgment, but a divided court of appeal reversed, finding "issues of material fact as to whether Mrs. Beis suffered emotional distress as a result of the defendants' admitted legal malpractice."[3]
While we acknowledge the statements in Beis, we find them hard to square with the more recent statement of the supreme court in Costello v. Hardy, supra: "A plaintiff can have no greater rights against attorneys for the negligent handling of a claim than are available in the underlying claim." Moreover, a claim for emotional distress, in the absence of a physical injury, normally requires proof that (1) the defendant's conduct was "extreme and outrageous," (2) the plaintiff's emotional distress was severe, and (3) the defendant desired to inflict emotional distress or knew that such distress would be certain or substantially certain to result from his conduct. White v. Monsanto Co., 585 So.2d 1205 (La.1991). Whittington candidly admitted that after he left the Magellan, he sought no psychiatric attention or counseling of any kind; only some nine months later, on Kelly's recommendation, did he contact a social worker. He admitted holding several other jobs and even running for sheriff in July 2003. Upon de novo review, we find Whittington would not be able to prove his entitlement to damages for emotional distress. The district court was not wrong in granting the motion for summary judgment.
We must observe, however, that Whittington has made an exceedingly strong showing of the first element of emotional distress  that Kelly's conduct was extreme and outrageous. It is undisputed that Kelly initially told Whittington he had a "good case," and over a 3½-month period reassured him that his claim was significant. Kelly had him sign two affidavits to be filed with the EEOC and sent him for *695 treatment with a social worker, thus reinforcing Whittington's confidence in his claim and his attorney. Impressively, Kelly made a $750,000 demand on Whittington's employers and forwarded a copy to Whittington. Even when he withdrew from the case, Kelly reiterated that Whittington had a "good claim" and had been "greatly harmed." Only later did Whittington learn that Kelly failed to file suit and, in a shocking turnaround, thought the sexual harassment claim had no validity. We are troubled by the timing of Kelly's withdrawal from the case, as well as the competence of his representations to Whittington. Nonetheless, these considerations do not justify reversing the summary judgment.

Conclusion
For the reasons expressed, the summary judgment is affirmed. Costs are assessed to the appellant, James Whittington.
AFFIRMED.
GASKINS, J. Concurs without reasons.
NOTES
[1] Whittington's original petition incorrectly referred to Phillips as "Christopher T. Phillip" and to Kelly's law firm as "the Law Firm of Kirby D. Kelly."
[2] Henderson v. Domingue, 93-102 (La.App. 3 Cir. 11/3/93), 626 So.2d 555, writ denied, 93-2976 (La.1/28/94), 630 So.2d 799; Chatelain v. Rabalais, 2004-28 (La.App. 3 Cir. 7/7/04), 877 So.2d 324; Sherwin-Williams Co. v. First Louisiana Constr. Inc., XXXX-XXXX (La.App. 1 Cir. 5/6/05), 915 So.2d 841.
[3] One judge wrote in concurrence that Mrs. Beis did have a valid underlying claim of medical malpractice; even if she did not, however, he questioned whether she could still claim damages for emotional distress.